# Exhibit 4

To the  Declaration of J. Michael Keyes iso
Defendant's Motion for Summary Judgment

DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4

   MICHAEL GRECCO PRODUCTIONS, )
5  INC.,                       )
                               )
6       Plaintiff,             )
                               )
7          vs.                 )    Case No.
                               )    2:24-CV-04837-FLA-MAR
8  TIKTOK, INC.,               )
                               )
9       Defendant.             )
   ___                         )
10

11

12           CONFIDENTIAL VIDEO DEPOSITION OF

13                   MICHAEL GRECCO

14                  Santa Monica, CA

15               Friday, July 18, 2025

16

17

18

19

   STENOGRAPHICALLY REPORTED BY:
20
   SUSAN F. MAGEE, RPR, CCRR, CLR, CSR No. 11661
21

22  Job No. 10168456

23

24

25

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4

MICHAEL GRECCO PRODUCTIONS, )
5   INC.,                      )
                               )
6        Plaintiff,            )
                               )
7           vs.                )  Case No.
                               )  2:24-CV-04837-FLA-MAR
8   TIKTOK, INC.,              )
                               )
9        Defendant.            )
___                            )
10

11

12          Confidential video deposition of

13   MICHAEL GRECCO, taken on behalf of Defendant,

14   appearing remotely from Santa Monica, CA, beginning

15   at 9:37 a.m. and ending at 6:00 p.m. on Friday,

16   July 18, 2025 before SUSAN F. MAGEE, RPR, CCRR, CLR,

17   CSR No. 11661.

18

19

20

21

22

23

24

25

**Michael Grecco**

**Confidential**     **Michael Grecco Productions, Inc. vs. TikTok, Inc.**

```
 1   APPEARANCES:

 2       For the Plaintiff:

 3           COPYCAT LEGAL PLLC

 4           JONATHAN ALEJANDRINO, ESQ.

 5           LAUREN M. HAUSMAN, ESQ.

 6           (Appearing via videoconference)

 7           3111 North University Drive

 8           Suite 301

 9           Coral Springs, FL 33065

10           (877) 437-6228

11           jonathan@copycatlegal.com

12           lauren@copycatlegal.com

13

14       For the Defendant:

15           DORSEY & WHITNEY LLP

16           J. MICHAEL KEYES, ESQ.

17           CONNOR J. HANSEN, ESQ.

18           (Appearing via videoconference)

19           701 Fifth Avenue

20           Suite 6100

21           Seattle, WA 98104

22           (206) 903-8800

23           keyes.mike@dorsey.com

24           hansen.connor@dorsey.com

25
```

**Page 3**

**Confidential**    **Michael Grecco Productions, Inc. vs. TikTok, Inc.**

```
1    APPEARANCES (continued):

2         Also Present (Appearing via videoconference):

3              BENJAMIN HALPERIN

4              ALEXA LIBERT

5

6         The Videographer

7         (Appearing via videoconference):

8              MEYNARD BERNARDO

9                          --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Michael Grecco

Confidential        Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1        Q.   Okay.  You're familiar with the

2   entertainment platform TikTok, are you not?

3        A.   I am.

4        Q.   Do you have a TikTok account, sir?

5        A.   I do not.

6        Q.   Have you ever had a TikTok account?

7        A.   I believe I tried to have one for, like, a

8   few days and hated it.

9        Q.   Okay.  Are you familiar with TikTok shop?

10        A.   No.

11        Q.   Have you ever heard of TikTok shop?

12        A.   No.

13        Q.   So you've never visited TikTok shop?

14        A.   No.

15        MR. KEYES:  Mr. Bernardo, could you drop

16   into chat Exhibit No. 1, please.

17        (Exhibit 1, Amended Notice of Deposition of

18   Michael Grecco, marked for identification.)

19   BY MR. KEYES:

20        Q.   So Mr. Grecco, throughout the day you'll

21   bee -- I'll be sharing exhibits with you or the

22   court reporter will via the Chat function on Zoom

23   here.

24        A.   Okay.

25        Q.   So you've probably gone through this

**Confidential**    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1    process before.  You'll just pop open those

2    exhibits, and let me know once you have it in front

3    of you, okay?

4        A.   They normally come in as an attachment that

5    opens as a PDF.  You're doing this web-based

6    instead?

7        Q.   Correct.

8        A.   Okay.

9        Q.   Let me know when you're there.

10        A.   Okay.  I'm here.

11        Q.   Have you seen Exhibit 1 to your deposition?

12        A.   Yes.

13        Q.   And this is a notice of deposition for you

14    to appear today; correct?

15        A.   Yes.

16            MR. KEYES:  All right.  If we could please

17    drop Exhibit 2 in the chat.

18            (Exhibit 2, Amended Notice of 30(b)(6)

19    Deposition of Michael Grecco Productions, Inc.,

20    marked for identification.)

21    BY MR. KEYES:

22        Q.   While that's pulling up here, Mr. Grecco,

23    you understand that you're here to provide testimony

24    today in your personal capacity as a witness;

25    correct?

Confidential

Michael Grecco                                    Michael Grecco Productions, Inc. vs.
                                                                         TikTok, Inc.

 1      A.  Yes.  I don't think I can provide testimony

 2   for anyone else, so . . .

 3      Q.  Well, actually that's not entirely accurate

 4   because you're also here as a 30(b)(6) deponent too,

 5   aren't you, sir?

 6      A.  Correct.

 7      Q.  Okay.  So in that regard, let's take a look

 8   at Exhibit 2, please.

 9      A.  Okay.  I'm here.

10      Q.  All right.  Have you seen this document

11   before?

12      A.  I believe so, yes.

13      Q.  And you see that this is a document,

14   Exhibit 2, entitled "Amended Notice of 30(b)(6)

15   Deposition of Michael Grecco Productions, Inc.;"

16   right?

17      A.  Correct.

18      Q.  And Michael Grecco Productions, Inc. is

19   your company; right?

20      A.  That is correct.

21      Q.  You also understand that you're here to

22   provide testimony on behalf of your corporation;

23   correct?

24      A.  To the best that I have that knowledge,

25   correct.

1            MR. ALEJANDRINO:  I will -- I think the

2    question of going topic by topic is kind of touching

3    on what was discussed but understood.

4    BY MR. KEYES:

5        Q.  You own Michael Grecco Productions; right,

6    sir?

7        A.  That's correct.

8        Q.  Does anybody else have an ownership

9    interest in that corporation?

10       A.  No.

11       Q.  You're married, are you not?

12       A.  I am.

13       Q.  Okay.  And your spouse's name is?

14       A.  Elizabeth Grecco Waterman.

15       Q.  Okay.  Does Elizabeth Waterman have an

16   ownership interest in Michael Grecco Productions?

17       A.  She does not.

18       Q.  Are you personally, sir, a W-2 employee of

19   Michael Grecco Productions?

20       A.  No.  I get paid by officer loan.  I've put

21   in money to the company, and I get paid by officer

22   loan; so we don't file a W-2.

23       Q.  Okay.  So you essentially take draws from

24   your company?

25       A.  I get paid back the loan money I put in.

Michael Grecco                                          Michael Grecco Productions, Inc. vs.
                                                                        TikTok, Inc.

```
 1        Q.  All right.  Does Michael Grecco Productions
 2   have any employees?
 3        A.  Subcontractors.
 4        Q.  Okay.  So by "subcontractors," I take it
 5   you mean independent contractors?
 6        A.  Correct.
 7        Q.  And how are your subcontractors compensated
 8   for the work they do with Michael Grecco
 9   Productions?
10        A.  With U.S. dollars.
11        Q.  Okay.  I take it you then would provide
12   them with a W-9 at the end of the year?  How does
13   that work?
14        A.  A 1099.
15        Q.  A 1099.  Thank you.  Yes.
16            Okay.  So let's go back to Exhibit 2, if
17   you would, sir.
18        A.  Okay.
19        Q.  You see there are 26 topics here listed
20   here; right?
21        A.  Let me open it up.
22            Yes.
23        Q.  Are there any topics on this list that you
24   are not prepared to talk about today?
25        A.  I'm going to answer every question to the
```

Page 22

1   Society For Collective Rights Licensing,

2   approximately how much are those royalties on an

3   annual basis?

4        A.   Under $5,000.

5        Q.   What is Titan Copyright?

6        A.   It's a copyright protection company for

7   photographers.

8        Q.   And what does it do exactly?

9        A.   It searches for photographers' work on the

10  Internet, and then we help manage the claim through

11  the use of law firms.

12       Q.   So is Titan Copyright how you discovered

13  the alleged infringement that led to this lawsuit?

14       A.   No.

15       Q.   How did you discover the allegedly

16  infringing works in this case?

17       A.   We use, like, five different search

18  engines.  So I didn't discover them.  I -- we have a

19  team of people that does it.  My wife manages my --

20  the discovery of my claims and my admin

21  Torina Yamada helps her.

22       Q.   Okay.  Can you spell your admin's name,

23  please.

24       A.   T-o-r-i-n-a, Yamada, Y-a-m-a-d-a.

25       Q.   Now, you mentioned a moment ago that you

Michael Grecco                    Confidential         Michael Grecco Productions, Inc. vs.
                                                                              TikTok, Inc.

1    use approximately five different search engines to

2    look for allegedly infringing content; is that

3    correct?

4         A.  Well, it's not allegedly infringing

5    content.  It's infringing content for the most part.

6    It's very rare that it's authorized.

7              Yes.

8         Q.  Okay.  What are those search engines?

9         A.  They change from time to time.  But it's

10   Pixsy, COPYTRACK, Google Lens, Google Images,

11   Lenso.io.

12             And in the past we've used a company called

13   Infringement.Report and another company called

14   PlagueHunter.  Both of those companies are out of

15   business.

16        Q.  Thank you.  You mentioned that your wife

17   searches for allegedly infringing content on your

18   behalf; right?

19        A.  Yes.

20        Q.  Okay.  And was Ms. Waterman, is she the

21   individual that I take it did the searching for the

22   allegedly infringing content in this case?

23        A.  Yes.

24        Q.  Do you know how she went about conducting

25   her search?

1          I understand you're a photographer and that

2     you license out your photographs; right?

3          A.   That's correct.

4          Q.   I'd like to understand a little bit about

5     pricing that you use.

6          So I understand that you are or at least

7     you had been in the past commissioned to take

8     photographs; right?

9          A.   That is correct.

10         Q.   So let's say you're commissioned.

11         Are you still being commissioned to take

12    photographs?

13         A.   Yes.

14         Q.   And as a matter of fact, the works that are

15    involved in that lawsuit, you were commissioned to

16    take those photographs; right?

17         A.   That is correct.

18         Q.   So when you're commissioned to do a photo

19    shoot for a client, you typically charge, like, some

20    sort of creative fee; right?

21         A.   That's correct.

22         Q.   So fair to say that that's kind of related

23    to your artistry, your creativeness in terms of your

24    craft?

25         A.   It's a license.

Michael Grecco

Confidential          Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1    compensated through a return of officer loans.

2        Q.  Okay.  At any point did you personally,

3    Michael Grecco, have a written employment agreement

4    with Michael Grecco Photography, Inc.?

5        A.  Whatever agreement I have is in my

6    operating agreement.

7        Q.  Okay.  So you understand, an operating

8    agreement, that's not an employee agreement; right?

9        A.  I believe it might stipulate my role in the

10   company and copyrights and things like that,

11   so . . .

12       Q.  Okay.  Has that operating agreement been

13   produced in this case?

14       A.  I'm not sure.  I don't have the -- all the

15   entire --

16       Q.  Okay.

17       A.  -- document request.  But again, I'm happy

18   to produce it.

19       Q.  Okay.  I appreciate that.  Thank you.

20       A.  Sure.

21       Q.  Why did you change -- or why did you form

22   Michael Grecco Photography, Inc.?

23       A.  For a combination of -- for a combination

24   of liability and tax reasons.

25       Q.  All right.  Now, for images created after

1        A.   2014 to '16, let's say.

2        Q.   Okay.  And why did you stop authorizing

3    Shutterstock took to license your photographs?

4        A.   They weren't paying me, and they were

5    licensing our work very -- way too low.

6        Q.   Other than Getty Images and Shutterstock,

7    have you ever used any other third parties to

8    license your works?

9        A.   Yes.

10        Q.   Which ones?

11        A.   A Japanese agency called Aflo, a German

12   agency called DAP, Deutscheland Association --

13   Associated Pictures or something like that.  Or it's

14   DPA maybe, Deutscheland Picture Agency.

15            And I'm currently with Iconic Images.

16        Q.   How long have you been with Iconic Images?

17        A.   Five years.

18        Q.   Do you have an ownership interest in

19   Iconic images?

20        A.   I do not.

21        Q.   Iconic Images also license out other

22   photographs other than yours; right?

23        A.   Yes.

24        Q.   Do you have an approximation as to how many

25   other photographers' works are licensed through

Confidential    Michael Grecco Productions, Inc. vs. TikTok, Inc.

1   to complete this photograph of Xena?

2       A.  Well, we flew in a week ahead of time.  We

3   scouted, prepped, rented equipment, did a tech scout

4   the day before, and then we probably spent 14 or 16

5   hours shooting that day.

6       Q.  Now, Photograph No. 1 was taken by you in

7   1997, so that was before you formed your company;

8   right?

9       A.  Correct.

10      Q.  As you sit here today, how much revenue

11  have you generated from licensing this first

12  photograph?

13      A.  I would have to look it up.

14      Q.  Okay.  Do you have an approximation?

15      A.  I do not.

16      Q.  Would you have a record of how much revenue

17  you've generated from licensing this first

18  photograph?

19      A.  Yeah.

20      Q.  And where would that record be?

21      A.  In our records.

22      Q.  Okay.  Are your records kept

23  electronically?

24      A.  They're both physical and electronic.

25      Q.  All right.  So for purposes of this case,

1    Second Amended Complaint?

2        A.  I do.

3        Q.  Now, this was taken, this second

4    photograph, during that same photo shoot; right?

5        A.  That's correct.

6        Q.  All right.  As you sit here today, sir, can

7    you identify how much revenue you generated from

8    licensing this second photograph in the complaint?

9        A.  Answer is going to be the same as the --

10   the same as the other answer.  I don't know unless I

11   look at the records.

12       Q.  Okay.  But you do have records with respect

13   to this second photograph specifically as far as the

14   revenue that you or your company have generated from

15   licensing it; right?

16       A.  We do.

17       Q.  And you have no objection to producing

18   those records, do you?

19       A.  Asked and answered, Counselor.

20       Q.  Sir, I'm going to be going through each and

21   every photograph.

22       A.  For all of these photographs, if we have

23   records that you have not received, we are willing

24   to deliver them to you.

25       Q.  Okay.  Well, I'm going to be asking

**Confidential**    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1          A.   My attorney at the time.

2          Q.   **And who was your attorney at the time?**

3          A.   Stephen Spataro.

4          Q.   **Are you still working with that individual?**

5          A.   I am not.

6          Q.   **All right.  Let's look at the third**

7     **photograph.  I believe you -- this is a photograph**

8     **of Andy Garcia; right?**

9          A.   That's correct.

10         Q.   **Did he hire you to take this photo?**

11         A.   He did not.

12         Q.   **Who did?**

13         A.   The magazine.

14         Q.   **And what magazine is that?**

15         A.   USA Weekend magazine.

16         Q.   **Okay.  And did you have a written agreement**

17    **with USA magazine with respect to this Andy Garcia**

18    **photograph?**

19         A.   My license and my invoice and delivery

20    memos.

21         Q.   **Okay.  But other than that, that would**

22    **be -- that would be it, though; right?**

23         A.   That's correct.

24         Q.   **Okay.  This photograph of Andy Garcia, I**

25    **believe it's one of the ones that you mentioned**

1    have the process in place?

2        A.   Correct.

3        Q.   All right.

4        A.   I also think it was a selected outtake by

5    Getty Images that we -- when we submitted to Getty

6    Images, we wanted to make sure everything that they

7    selected that hadn't been in print previously was

8    registered.

9        Q.   Okay.  With respect to this Andy Garcia

10   photograph, the third photograph in this case, how

11   much revenue have you generated from licensing this

12   particular work?

13       A.   No idea.

14       Q.   And as you sit here today, you can't

15   approximate?

16       A.   I cannot.

17       Q.   To the extent you generated any revenue --

18   and when I say "you," I mean both you and your

19   company.

20           To the extent that you generated any

21   revenue with respect to this Andy Garcia photograph,

22   you would have a record of that; yes?

23       A.   If we have records, we are happy to share

24   them with you.

25       Q.   Okay.  Thank you.

Michael Grecco

1          Let's look at the fourth photograph.  Can

2    you identify this group here?  This is En Vogue;

3    correct?

4          A.  That is correct.

5          Q.  Did En Vogue, the group, hire you to take

6    this photograph?

7          A.  They did not.

8          Q.  Who did?

9          A.  The magazine.

10          Q.  What magazine?

11          A.  I believe it was Focus Magazine out of

12    San Francisco, but I -- that's to the best of my

13    knowledge.  I can't recall the specific magazine.

14          Q.  Okay.  Did you have a written agreement

15    with Focus Magazine?

16          A.  I'm sure we did.

17          Q.  Has that agreement been produced in this

18    case?

19          A.  If it hasn't, we'd be happy to produce it.

20    We -- it might be old enough that we don't have it,

21    that written agreement.

22          Q.  Do you have a document retention policy at

23    your company?

24          A.  Yes.

25          Q.  And what is that policy?

1    to the beginning, that that revenue information

2    would be reflected in the license agreements and

3    invoices?

4        A.   The revenue information would be, yes,

5    reflected in my invoices and with any licensing

6    records that we've been given or any internal

7    licensing records.

8        Q.   Okay.  Thank you.  As you sit here today,

9    sir, with respect to the fourth photograph, again

10   it's a picture of En Vogue here.

11            How much revenue have you or the company

12   generated with respect to licensing of this En Vogue

13   photograph?

14       A.   I would have to look at our records.

15       Q.   Okay.  Can you provide me with an

16   approximation as you sit here today?

17       A.   I cannot.

18       Q.   Are you -- is it your testimony that you

19   have generated revenue with respect to this fourth

20   photograph, or are you just not certain?

21       A.   I've generated revenue with every

22   photograph in here since I shot them on assignment,

23   and I was paid for them, and they have been licensed

24   after that.

25            How much that revenue is, I'm not willing

Michael Grecco                    **Confidential**        Michael Grecco Productions, Inc. vs.
                                                                        TikTok, Inc.

 1  know what our discovery deadline is so I can't even

 2  offer it.  It's going to be up to counsel.

 3           But if you want to pull the plug on this

 4  and me grab licensing records, I -- you know, I'm

 5  happy to do so.

 6  BY MR. KEYES:

 7     Q.  Okay.  I'm not pulling the plug.  I just

 8  want to understand the facts here.

 9           It sounds like you're not aware of being

10  able to testify with respect to specific revenue

11  generation with respect to any of these photographs.

12  It's obviously a key issue in the case.

13           You would agree with me, wouldn't you, sir?

14           MR. ALEJANDRINO:  Object to form.

15           Michael, you're muted.

16           THE WITNESS:  Yeah, but I believe those

17  documents have been produced for you already in

18  discovery.

19  BY MR. KEYES:

20     Q.  Okay.  Let's move on to the fifth

21  photograph.

22           You took this photograph in 1997; right?

23     A.  No.  I think that that was a mistake made

24  in this.  I -- it was taken in 1985.

25     Q.  Okay.

1        A.    It was a mistake made in the complaint.

2        Q.    Okay.  And you just didn't catch that when

3    you reviewed the complaint before it was filed?

4        A.    Correct.

5        Q.    All right.  Who is 'Til Tuesday?

6        A.    A band.

7        Q.    Are they still in existence?

8        A.    They played Cruel World a couple of months

9    ago, yes.

10       Q.    Okay.  Who did you take this fifth

11   photograph on behalf of?  Who hired you?

12       A.    I believe the band did.

13       Q.    And did you have a personal relationship

14   with any of the band members?

15       A.    Yes.

16       Q.    Okay.  Which one?

17       A.    All of them.

18       Q.    So they hired you in approximately 1985 to

19   take these photographs?

20       A.    Correct.

21       Q.    Or take this photograph, I should say, to

22   be more specific?

23       A.    Correct.

24       Q.    As you sit here today, can you identify any

25   revenue that you generated from licensing this

Confidential    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1    photograph?

2        A.  Not without looking at the licensing

3    records.

4        Q.  All right.  Did you have a written

5    agreement with 'Til Tuesday?

6        A.  I do not believe we do.

7        Q.  And by -- by "written agreement," would you

8    have had any invoices that reflected that they were

9    hiring you to take this photo?

10       A.  I do not believe in 1985 that there was a

11   written invoice for this -- for this group of

12   photographs, this assignment.

13       Q.  Okay.  Do you recall if you were paid for

14   this photo shoot?

15       A.  Yes.

16       Q.  Do you recall how much you were paid for

17   it?

18       A.  I believe it was $2,500 at the time.  Fee

19   only, license only.  Not expenses.

20       Q.  Okay.  When you say "fee only," you mean

21   creative fee?

22       A.  Yeah.  What we would really consider the

23   license, yes.

24       Q.  All right.  Let's move on to the --

25       A.  Creative fee is a -- is a marketing term

```
 1        A.   I don't think there's been more than one

 2   conversation, but I only recall one conversation.

 3        Q.   Okay.  And approximately how long ago was

 4   that?

 5        A.   A few weeks ago.

 6        Q.   Okay.  With respect to this seventh

 7   photograph, you said you were retained by Wired

 8   Magazine; correct?

 9        A.   Correct.

10        Q.   Other than the fee that was generated by

11   the photo shoot for Wired Magazine, as you sit here

12   today, can you testify as to whether you or your

13   company have generated any additional revenue with

14   respect to the seventh photograph?

15        A.   Yes.

16        Q.   Okay.  How much revenue have you generated

17   from that photograph?

18        A.   I'm not going to answer that without

19   looking at the records.

20        Q.   Okay.  But you're aware that there are

21   records internally kept by the company with respect

22   to revenue generation with respect to this seventh

23   photograph?

24        A.   We retain all licensing agreements, and

25   there's been no specific policy to delete or destroy
```

1    these.  So yeah, I mean, I can make an educated

2    guess that these documents are kept, and we have

3    them.

4        Q.  All right.  Let's move on.  The eighth

5    photograph.  Again, this is a photograph of Xena

6    princess warrior; correct?

7        A.  That's correct.

8        Q.  Now, was this photograph, the eighth

9    photograph that's in your Second Amended Complaint,

10   was this part of the same Xena shoot that we've

11   already talked about?

12       A.  It was.

13       Q.  As you sit here today, can you testify as

14   to the amount of revenue, if any, you or your

15   company have generated by licensing this eighth

16   photograph?

17       A.  I cannot.

18       Q.  Okay.  But to the extent you have such

19   records, you'll produce them?

20       A.  Asked and answered.  It's going to be the

21   same for every image, sir.

22       Q.  Okay.

23       A.  If we have records that you have not been

24   sent, we are willing to produce them for you.

25       Q.  I understand, and I appreciate that.  You

```
 1   BY MR. KEYES:

 2        Q.  Other than the fee that you just mentioned

 3   with respect to the 11th photograph, as you sit here

 4   today, can you approximate how much other revenue

 5   you've generated from licensing this 11th

 6   photograph?

 7        A.  I cannot.

 8        Q.  Okay.  Do you know if --

 9            THE REPORTER:  Can we take a --

10            MR. KEYES:  Do you want to take a break?

11            THE REPORTER:  Whenever it's a good time.

12            MR. KEYES:  Sure.  Now is fine.

13            THE VIDEOGRAPHER:  Time is 11:25 a.m.  We

14   are off the record.

15            (Recess taken from 11:25 a.m. to

16   11:40 a.m.)

17            THE VIDEOGRAPHER:  Time is 11:40 a.m.

18   We're back on the record.

19   BY MR. KEYES:

20        Q.  Mr. Grecco, right before the break we were

21   discussing the 11th photograph set forth in

22   Exhibit 5 to your deposition today.

23        A.  Okay.

24        Q.  You mentioned a little bit earlier about

25   Iconic licensing as your licensing agent for your
```

**Confidential**    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

```
 1        A.  No.

 2        Q.  Who commissioned you to take this

 3   photograph?

 4        A.  Fox Broadcasting.

 5        Q.  Fox Broadcasting.  Okay.  And Fox

 6   Broadcasting commissioned you in 1998 to take this

 7   picture of Ms. Anderson?

 8        A.  I believe that that's a mistake.  I believe

 9   it's 1993.

10        Q.  Okay.

11        A.  I think the 1 is missing from the title.

12   It looks like it was cut and paste, and the 1 was

13   dropped.

14        Q.  I'm sorry.  Can you refer to me where

15   you're speaking specifically?

16        A.  Yeah.  Each one of our photographs has the

17   creation date at the beginning of the name.  So if

18   you look at 9930625, it's actually 19930625, which

19   would be June 25th of 1993.

20        Q.  Understood.

21        A.  Looks like when it was cut-and-paste they

22   dropped the number 1.

23        Q.  And in that same title that you're

24   referencing, do you see the 0006 at the end?

25        A.  Correct.
```

Michael Grecco

**Confidential**          Michael Grecco Productions, Inc. vs.
                                                    TikTok, Inc.

1    went up, so . . .

2         Q.   Okay.  As you sit here today, you don't

3    know without looking at your records as to whether

4    you generated any additional revenue with respect to

5    the licensing of this 12th photograph; right?

6         A.   I could say that there has been revenue.

7    What -- how much revenue I could not say.

8         Q.   Okay.  And when you say there has been

9    revenue, can you provide an approximation as to how

10   much revenue?

11        A.   No.

12        Q.   All right.  13th photograph.  Do you see

13   where I am, paragraph 36 --

14        A.   Yep.

15        Q.   -- of Exhibit 5 --

16        A.   Yep.

17        Q.   -- to your deposition?

18        A.   Yes.

19        Q.   It's an image of Johnny Depp; right?

20        A.   Yeah.

21        Q.   Sir, who hired you to take this image of

22   Mr. Depp?

23        A.   Movieline magazine.

24        Q.   Okay.  Was there a written agreement with

25   Movieline magazine?

```
 1        A.  Only the invoice I provided them.

 2        Q.  Do you remember how much you charged

 3   Movieline magazine for this photo shoot?

 4        A.  Movieline magazine.  And no.

 5        Q.  That's what I said.  Magazine.  Did I --

 6   did I get that --

 7        A.  I heard something else, but that's fine.

 8        Q.  Okay.  Just for clarification, Movie-,

 9   M-o-v-i-e-, -line, -l-i-n-e?

10        A.  Correct.  One word.

11        Q.  Okay.  Thank you.

12             So it says, "In 2008, plaintiff created

13   this photograph."

14             Do you see that?

15        A.  Yes.

16        Q.  Is that a mistake as well?

17        A.  I believe it is.  I believe that's the

18   copyright registration date and not the creation

19   date.

20        Q.  Okay.

21        A.  The creation dates are all in the image

22   title.

23        Q.  Right.  So if I understand from your prior

24   testimony, this picture of Johnny Depp was taken --

25   would it be in 1994?
```

1      A.   That's correct.

2      Q.   All right.  Do you recall the circumstances

3   related to this particular photo shoot of Mr. Depp?

4      A.   Yes.

5      Q.   Was it on set somewhere?

6      A.   It was in a studio that I rented.

7      Q.   Okay.  Got it.  And again, I apologize.

8   Maybe I did ask this.

9           Do you recall what the fee was that you

10  charged Movieline magazine for this?

11     A.   I do not.

12     Q.   All right.  It was in the 1994 time frame.

13  So would it be fair to say that it was probably

14  similar to the fee that you charged Fox Broadcasting

15  for the Gillian Anderson photograph?

16     A.   No.

17     Q.   It would not be fair to state that?

18     A.   Correct.

19     Q.   Why not?

20     A.   Because it was editorial, and the rates are

21  not the same.

22     Q.   Got it.  What do you mean by "editorial"?

23     A.   Not a commercial shoot.  Not an advertising

24  shoot.  It was being used for the cover of a

25  magazine.

Confidential    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1      Q.  And why is that a significant distinction

2   for you, if it is?

3      A.  It's not a significant distinction for me.

4   It's a significant distinction for the people who

5   pay licenses.

6      Q.  Right.  Because one is -- one is larger

7   than the other typically; right?

8      A.  But you -- yes.  Because on the -- for the

9   advertising use, they're buying -- spending a lot of

10  money buying ad space, and that's calculated into

11  the license.

12     Q.  All right.  Let's go to the 14th

13  photograph, please.  So this is a picture that you

14  took of Michael Jackson; right?

15     A.  Correct.

16     Q.  The allegation is that it was taken in

17  2008; right?

18     A.  I believe that's the registration time

19  period, but it was actually shot in 1989.

20     Q.  Right.  And you know that because you're

21  looking at the naming convention on the title here;

22  right?

23     A.  Correct.

24     Q.  Got it.  So if we went back through and

25  looked at all the other photographs and compared the

Michael Grecco

**Confidential**    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1    alleged date of creation with the actual date of

2    creation, would we -- would we see other

3    discrepancies as well?

4        A.  I'm not sure.  I missed it at the time,

5    so . . .

6        Q.  Okay.  Got it.  Who commissioned you to

7    create this -- to take this photo of Mr. Jackson?

8        A.  I believe it was -- I remember almost every

9    shoot, but I believe this was USA Today, the

10   newspaper.

11       Q.  And it would have been back in

12   approximately 1989?

13       A.  Correct.

14       Q.  And did you have a written agreement with

15   USA Today with respect to Mr. Jackson's photograph?

16       A.  Only the license I provided in the invoice.

17        Q.  Only the license you provided USA Today?

18       A.  In the invoice.  There's a license in all

19   my invoices.

20       Q.  Okay.  So is it --

21       A.  It's usage terms.

22       Q.  Okay.  We're going to look at some of -- a

23   few that have been produced to us in this case.

24   We've typically seen an invoice that has certain

25   line item charges.  And then either on the back page

Confidential

1   documents to see if they actually licensed this

2   specific photograph.

3        Q.  All right.  Got it.  Let's move on the 16th

4   photograph.

5            This is a photograph you took of

6   Morgan Freeman; right?

7        A.  Yes.

8        Q.  Where was this photograph taken?

9        A.  I believe on the Fox lot.

10       Q.  So was it Fox broadcasting that

11   commissioned you to take this photograph of

12   Mr. Freeman?

13       A.  No.

14       Q.  Who was it?

15       A.  I believe it was one of Bloomberg's

16   magazines.

17       Q.  Do you recall how much you charged

18   Bloomberg magazines for the licensing of this

19   photograph of Mr. Freeman?

20       A.  I do not.

21       Q.  Let's look at the 17th photograph.  This is

22   the British rock band -- is it Siouxsie and the

23   Banshees?

24       A.  Yes.  They would be considered a new wave

25   band.

1          Q.   Okay.  So you created or took this photo

2     back in 1980.

3               Did you take it over somewhere in the U.K.?

4          A.   No.

5          Q.   Who commissioned you to take this

6     photograph?

7          A.   Boston Rock magazine.

8          Q.   As you sit here today, do you recall

9     approximately what the licensing fee was that you

10    charged Boston Rock?

11         A.   I do not remember, and I don't believe

12    there were licensing records that go back that far.

13         Q.   Okay.  Yeah, that's fair, because you said

14    you've retained licensing records back to 1989;

15    right?

16         A.   Yes.

17         Q.   Okay.  Let's move on to the 18th

18    photograph.

19               Who hired you to take this photograph?

20         A.   This is Jet Li?

21         Q.   Okay.

22         A.   18?

23         Q.   18, yes, sir.

24         A.   Okay.  Photographs of Jet Li; correct?

25         Q.   Correct.

1        A.   Okay.

2        Q.   Paragraph 46 of your second amended

3    complaint.

4        A.   Okay.

5        Q.   Who commissioned you to take this

6    photograph?

7        A.   A special edition of People magazine.

8        Q.   Okay.  So this is another example where

9    it's incorrectly stated here that you took this

10   photograph in 1980; right?

11       A.   Correct.

12       Q.   You actually took this photograph in 1998;

13   right?

14       A.   Correct.

15       Q.   Okay.  Do you recall how much you charged

16   Special Edition People Magazine for the licensing of

17   this work?

18       A.   If I were to take an educated guess at the

19   time, the initial fee was probably $750 back then.

20   And additional space rate, depending on how big it

21   was used or if multiple images were used, were paid

22   in addition to that.

23       Q.   Okay.  Again, this is one of the

24   photographs that, to the extent that you licensed

25   this image out to third parties, that there -- you

Michael Grecco

1    the date.  That's when it was registered.

2         Q.  Right, because you actually took this

3    photograph back in 1980; isn't that right?

4         A.  That is correct.

5         Q.  Okay.  Who commissioned you to take this

6    22nd photograph?

7         A.  Boston Rock magazine.

8         Q.  Was this -- you previously testified as to

9    Boston Rock as a commissioning party with respect to

10   other works involved in this suit; right?

11        A.  I don't understand your question.

12        Q.  Well, the 17th photograph, the image of the

13   band the Siouxsie and the Banshees, remember that

14   one that we talked about?

15        A.  Okay.

16        Q.  You testified that Boston Rock magazine

17   commissioned you for that work too.

18             Do you remember that?

19        A.  Yes, that is correct.  Both of those --

20   both of these images were commissioned by Boston

21   Rock magazine.

22        Q.  Okay.  Was this part of the same photo

23   shoot, if you will?

24        A.  No.

25        Q.  Okay.  But both commissioned in 1980?

Page 119

1       A.   Yes.

2       Q.   With respect to the 22nd photograph here,

3    sir, do you recall how much the licensing fee was

4    that you charged Boston Rock magazine?

5       A.   I do not.  It was not a lot at the time.

6       Q.   Right.  I mean, given that this is back in

7    1980, do you know if you have any records that

8    reflect what the arrangement was with Boston Rock

9    magazine?

10       A.   I have no records from that time.

11       Q.   All right.  Let's look at page 28, "II.

12    Defendant's Unlawful Activities."

13            Do you see where I am?

14       A.   Yep.

15       Q.   Please go to paragraph 60.

16       A.   Okay.

17       Q.   Now, paragraph 60 reads, "On multiple dates

18    after each photograph comprising the work was

19    registered, one or more of defendant's users caused

20    each photograph comprising the work to be

21    displayed/published on defendant's social media

22    app/website platform."

23            Do you see that?

24       A.   I do.

25       Q.   So you don't allege that TikTok actually

Michael Grecco

1   caused one or more of your photographs to be

2   published; right?

3        A.  I do not.

4        Q.  And you don't have any facts to suggest

5   that TikTok encouraged any of its users to post any

6   of your photographs, do you?

7        A.  No.  I just know that TikTok didn't take it

8   down when it was brought to their attention, and 14

9   out of the 22 are still up, you know.  You know, and

10  to me that's willful infringement.

11       So no one's accusing TikTok of direct

12  infringement.  Just we're accusing TikTok of not

13  following the law.

14       Q.  Paragraph 61 refers to Exhibit N.

15       Do you see that?

16       A.  Yes.

17       Q.  And you represent here it's a true and

18  correct copy of screenshots from TikTok's website.

19       Do you see that?

20       A.  Yes.

21       Q.  Who took those screen captures or

22  screenshots, as you call them?

23       A.  One of our staff members.  One of our -- I

24  shouldn't say "staff members."  I've used the wrong

25  word.  One of our foreign workers.

1  BY MR. KEYES:

2      Q.  I'll just ask you to answer my question,

3  sir.  So can you cite for me a single advertisement

4  that appeared on the TikTok platform where one of

5  your photographs at issue in this suit appeared?

6      A.  That's not what that paragraph says, my

7  friend.  That's not what it says.

8      Q.  I'm asking a different question, sir.

9      A.  Okay.

10     Q.  Do you --

11     A.  So no, I -- no, it -- it -- none of my

12  images have been used in an ad on TikTok.  Otherwise

13  we'd be suing the commercial entity that put up the

14  ad.

15     Q.  Okay.

16     A.  In addition to TikTok not taking it down.

17     Q.  Okay.

18     A.  But again, that's not what that

19  paragraph -- what that sentence says.

20     Q.  So when you say defendant -- we've already

21  established and you've already admitted that none of

22  your photographs appeared in any advertisements that

23  appeared on TikTok, but you still claim that there

24  was a direct financial benefit.

25          What was the amount of the financial

Michael Grecco                                                    TikTok, Inc.

1    this alleged damage?

2         A.   No.   I mean, but every time my work gets

3    posted and reposted on your client's platform, it

4    cancels our ability to license work exclusively in

5    territories and channels when it's publicly

6    available on a social media platform.   So it's --

7    you're undermining my ability to get the best rates

8    and the best licensing fees for my work.

9         Q.   Okay.   Well, let's talk about that.   So

10   you're saying that as a result of these images

11   appearing on TikTok.

12             Have you been deprived licensing revenue

13   from third parties?

14        A.   Well, I wouldn't know that obviously

15   because, if they've seen it elsewhere, they would

16   steal it rather than come license it.   And they're

17   not coming to us to license it exclusively if

18   they've seen it on the TikTok platform.

19        Q.   And how do you know that?

20        A.   Because I've been in the business for

21   almost 50 years.

22        Q.   Has anybody told you, sir, that they're not

23   going to license any of the photographs that are at

24   issue in this case because they saw them on TikTok?

25        A.   No, but why would someone come to me and

1      A.   No.   I just told you.   You're

2  misrepresenting my testimony.   You asked me when I

3  answered "50" how many times I had been deposed.

4          You have never asked me how many complaints

5  I've filed, you've never answered -- asked me how

6  many cases, and that doesn't reflect my statement.

7  You're, again, manipulating my testimony, and it's

8  not acceptable.

9      **Q.   Sir, how many complaints for copyright**

10 **infringement have you and your companies filed?**

11     A.   Which companies, sir?   On my behalf?

12     **Q.   Yes.**

13     A.   For our clients, for Titan, my wife?   What

14 are you referring to?

15     **Q.   Do you file lawsuits for Titan?**

16     A.   The firms we hire do.   The firms we use do.

17     **Q.   I'm not asking about third parties and if**

18 **they'd use the same law firm.   I want to know if**

19 **Michael Grecco -- how many federal complaints for**

20 **copyright infringement has Michael Grecco**

21 **Productions, Inc. or you personally, sir, filed.**

22          **How many?**

23     A.   I would have to look at the records.   It's

24 over 100.

25     **Q.   Okay.   So you took great umbrage that I**

**Confidential**

**Michael Grecco**                    Michael Grecco Productions, Inc. vs.
                                                    TikTok, Inc.

1    if the theater has ads all around the theater and

2    you have to walk into the theater, it -- the --

3    there's a benefit to be derived by putting content

4    in that theater or on that platform where there's

5    other advertising available.  So it's commercial.

6    BY MR. KEYES:

7        Q.  Okay.  I think you mentioned -- and again,

8    I'm not putting words in your mouth.  I just want to

9    understand that I understood your testimony

10   correctly, sir.

11       A.  Okay.



23       Q.  So when you say you can only go on what the

24   Internet is saying, do you believe everything that

25   you read on the Internet?  Okay.

**Page 148**

1              MR. KEYES:  I think now is a good time for

2      a break.  Why don't we --

3              THE WITNESS:  I'm willing -- I want to

4      finish up, so I'm willing to keep going if you can.

5              THE REPORTER:  I would like a break.

6              MR. KEYES:  I'm happy to keep going, but

7      let's take a break.

8                  We're off the record.

9              THE VIDEOGRAPHER:  The time is 2:20 p.m.

10     We are off the record.

11                (Recess taken from 2:20 p.m. to 2:34 p.m.)

12             THE VIDEOGRAPHER:  Time is 2:34 p.m.  We

13     are back on the record.

14     BY MR. KEYES:

15         **Q.  I want to go back to discuss your copyright**

16     **litigation history.**

17             **Of all of the copyright litigation cases**

18     **you've filed, Mr. Grecco, have any of them proceeded**

19     **to trial?**

20         A.  Define "proceeded to trial."  They were

21     filed.  They all proceeded to trial to one extent to

22     another.

23             Did they go to an actual trial, you're

24     asking me?

25         **Q.  Yes.  That's what that means.**

```
 1        A.  Well, it doesn't because, if you file
 2   and -- it's proceeding to trial.  No, none of them
 3   have been tried.
 4        Q.  Okay.
 5        A.  Usually when I get deposed, people want to
 6   settle.
 7        Q.  Have any of those various copyright cases
 8   that you've filed, do you know if they've been
 9   resolved at the summary judgment stage of the case?
10        A.  I don't believe so.  I don't believe we've
11   lost a summary judgment.  We've lost summary
12   judgments and won on appeal both in the Second and
13   the Ninth.
14        Q.  Have any of your copyright cases ended up
15   in you obtaining a default judgment?
16        A.  Yes.
17        Q.  Do you know approximately how many?
18        A.  A dozen.
19        Q.  So is it fair to say that you've never
20   tried a case, there's been a few summary judgments,
21   a dozen default judgments.
22            The rest of your cases get resolved through
23   settlement?
24            MR. ALEJANDRINO:  Object to form.
25            THE WITNESS:  That would be fair to say,
```

1    yes.

2    BY MR. KEYES:

3        Q.  The cases that have been resolved by

4    default judgment, do those also involve an instance

5    where you receive some sort of monetary judgment

6    from the court?

7        A.  Yes.

8        Q.  And have your entire settlements, to your

9    knowledge, always involved the exchange of money for

10   a settlement?

11           (Crosstalk.)

12           THE WITNESS:  Yes.  Yeah.  I mean, there

13   are cases where someone proves they're indigent and

14   -- by showing us our tax records and bank statements

15   and that they owe the IRS money and da da da da da,

16   and we usually close those cases.

17           THE REPORTER:  And I'm sorry, Mr. --

18   BY MR. KEYES:

19       Q.  How much money --

20           THE REPORTER:  I'm sorry, Mr. Alejandrino.

21   I didn't get your objection if you made one.

22           MR. ALEJANDRINO:  Object to form.

23           THE REPORTER:  Thank you.

24   BY MR. KEYES:

25       Q.  How much money have you made over the years

1    through copyright litigation?

2         A.  I would have to look at my documents.

3         Q.  Would it be more than a million dollars?

4         A.  Yes.

5         Q.  Would it be more than $5 million?

6         A.  Yes.

7         Q.  Would it be more than $10 million?

8         A.  No.

9         Q.  So you've generated somewhere between 5

10   million and $10 million through your litigation

11   history?

12        A.  I said that it would be close to or around

13   5 million so that would be a more accurate number.

14        Q.  Yeah, but somewhere between 5 and 10

15   million then?

16        A.  I didn't say that.

17             MR. ALEJANDRINO:  I'm going to object to

18   form.

19   BY MR. KEYES:

20        Q.  Do all your law firms work on a

21   contingency-fee basis?

22        A.  All the -- all our copyright law firms,

23   yes.

24             MR. KEYES:  I'd like to you pull up

25   Exhibit 20, please.

Michael Grecco                                Michael Grecco Productions, Inc. vs.
                                              TikTok, Inc.

1          Q.  Do you know who -- let's take that first

2     one on row 3, "Pixsy EW."

3              What's Pixsy EW?

4          A.  Well, Pixsy would be one of our search

5     sources, and EW would be the initials of my wife.

6          Q.  Okay.  So does this signify row 3, column Y

7     that your wife used Pixsy to find the allegedly

8     infringing content?

9          A.  I believe so, yes.  But again, I'm just

10    making -- I'm just making an educated guess, so yes.

11         Q.  If you look at row 4, column Y.  It says

12    "IR EW."  What does "IR" stand for?

13         A.  Infringement report.

14         Q.  And what is that infringement report?

15         A.  It's one of the search services that we --

16    you asked me about early in the deposition.

17         Q.  Okay.  Go down to column 6, "Torina."

18              That's your admin; right?

19         A.  Correct.  She gets paid commission on stuff

20    she finds, so the girls -- the ladies must be

21    keeping a record of who found what and when.

22         Q.  What's Torina's commission?  What's her

23    fee?

24         A.  She gets 5 percent of the net of what we

25    receive.  Or I should say the gross, which is our

 1  net.  The gross received by the company.

 2       Q.  So when you testified earlier that nobody

 3  other than your law firm has a financial stake in

 4  the outcome of this matter, that was incorrect,

 5  wasn't it?

 6            MR. ALEJANDRINO:  Object to form.

 7            THE WITNESS:  I don't think I -- I don't

 8  think I testified to that.  No one has a -- this is

 9  a commission that I agree to pay a subcontractor for

10  work she's done.

11  BY MR. KEYES:

12       Q.  Yeah, but she only gets paid --

13       A.  You could say my wife has a stake in it

14  too, but it's the company's case, and --

15       Q.  But Torina only gets paid for her efforts

16  in finding these alleged infringements if you

17  ultimately get paid in the case; right?

18       A.  That's true.

19       Q.  All right.  And so is it your position that

20  she doesn't have a financial stake in the outcome of

21  this litigation?

22       A.  Looking at this report and seeing that

23  she's found some of these, which I wasn't aware of

24  earlier, no, that's not my testimony.  It looks like

25  she found some of these herself.

1        Q.   In fact, she does have a financial interest

2    in the outcome of this case, doesn't she?

3        A.   Yes, she does.

4            Well, let me -- if what I'm assuming in

5    column Y is correct, the answer is yes.  If it's not

6    correct, the answer is no.  I don't know.  I'm just

7    looking at a column.  I would have to ask Torina or

8    Elizabeth what the column Y is.

9        Q.   Row 12, so we're still on column Y here.

10       A.   Okay.

11       Q.   "PlagHunter."  What's PlagHunter?

12       A.   PlagueHunter is one of the search service

13   that I disclosed to you at the beginning of the

14   deposition at 9:30 this morning when you asked.

15       Q.   Thank you.  But you didn't call it

16   PlagHunter, did you?

17       A.   "PlagueHunter."  I don't type these and

18   spell it like that.

19       Q.   Okay.  I -- I'm just trying to be precise,

20   sir.

21       A.   I know, but I didn't spell that.  Like,

22   that's a typo from someone.

23       Q.   Okay.  Let's look at column AB.  AB, this

24   column is Manager of the Case.

25           Do you see that?

Michael Grecco

Confidential          Michael Grecco Productions, Inc. vs.
                                          TikTok, Inc.

1    who captured these screenshots in Exhibit 21?

2         A.   One of our workers.   You would have to ask

3    Ms. Waterman.

4         Q.   Okay.   Now, this very first one on the very

5    first page of Exhibit 21, there is a video posted by

6    bellamy227.

7              Do you see that?

8         A.   I do.

9         Q.   And it appears that it was posted on 10/30,

10   October 30th of 2022?

11             Do you see that?

12        A.   I do.

13        Q.   And the Xena image shown here on this

14   screen capture, that's one of your images; right?

15        A.   It is.

16        Q.   It's actually the first photograph, isn't

17   it?

18        A.   It is.

19        Q.   Did you personally review this video before

20   sending a takedown notice?

21        A.   They send me all the cases to approve.

22   Routinely if it's a social media use and there's no

23   attribution to me and no hotlink to me -- and I

24   don't have a TikTok account so you couldn't hotlink

25   to me.

Page 208

1          But if it was Instagram and you hotlinked

2     to me and, you know, you put my handle there, we

3     wouldn't be sending a takedown notice.  We would

4     consider that publicity and marketing.

5          For TikTok, since I don't have an account,

6     they -- it's just automated that, if there's no

7     license, that they send a takedown notice.

8          **Q.  So my question was, did you view -- you**

9     **personally, Mr. Grecco, did you view this video --**

10         A.  Well, I answered you in a bit of a more

11    informative way.  No, because I don't have a TikTok

12    account, and they don't have the ability to tag me

13    or promote my own channel, so they have carte

14    blanche to send take down notices.

15         **Q.  Okay.  So is it fair to say that, with**

16    **respect to all of the videos, the alleged infringing**

17    **videos involved in this suit, that you did not**

18    **review them before your company issued takedown**

19    **notices?**

20         A.  I --

21              MR. ALEJANDRINO:  Object to form.

22              THE WITNESS:  I think I -- I think I looked

23    at some of them and was sort of flabbergasted at how

24    much stuff was on TikTok that was mine without a

25    license.

Confidential

```
 1              So I believe I looked at it.  I did not
 2    look at every one, and I did not approve every one.
 3    BY MR. KEYES:
 4         Q.  Okay.  But with respect to this very first
 5    video that involves your first photograph, did you
 6    look at this one before you --
 7         A.  I don't -- I don't -- I don't recall which
 8    ones I looked at and which ones I didn't.
 9         Q.  Let me finish my question, please, sir, and
10    then I'll let you answer.
11              So do you know if you looked at this very
12    first video before your company issued a takedown
13    notice?
14         A.  I do not remember if I looked at this one
15    in particular.
16         Q.  Who made the determination that it was
17    infringing?
18         A.  Sans license and sans being tagged, it's
19    infringing so that's my rule.  That's what I'm
20    willing to do.
21              So the team looks for a license.  They look
22    to see if anyone's licensed it or if it was licensed
23    by, you know, Iconic or -- you know, what the dates
24    were, if it was potentially licensed by Getty.  And
25    if it's not, they send a takedown notice.
```

Michael Grecco

1    Q.  Did your company consider the doctrine of

2    fair use before issuing the takedown notice with

3    respect to this first video?

4    A.  No.  Tiktok's a commercial platform and

5    meets none of the four criteria of fair use.  So

6    that's a BS defense that every infringer has no

7    defense uses and we hear every day.  That's like --

8    we call it the FU defense for a reason.

9    Q.  So is it fair to say, then, sir, that

10    before your company issued any of the takedown

11    notices in this case, that you didn't consider

12    whether -- you didn't consider fair use?

13        MR. ALEJANDRINO:  Object to form.

14        THE WITNESS:  I still don't consider fair

15    use.  There's no fair use defense here on a

16    commercial platform.

17    BY MR. KEYES:

18    Q.  And are you aware of any case that stands

19    for that proposition?

20    A.  Yeah.  We win -- we win fair use cases all

21    the time on summary judgment.  Everyone uses the

22    fair use defense.

23    Q.  But you just made the definitive statement,

24    sir, that there's no such fair use on a commercial

25    platform like TikTok, and I'm asking if you're aware

 1        A.   What's been shared 4 times?

 2        Q.   **This video?**

 3        A.   So what?  I'm opting for statutory damages.

 4   So what?

 5        Q.   **Do you know how many followers bellamy227**

 6   **has?**

 7        A.   No, and nor do I care.

 8        Q.   **As you sit here today, sir, you don't know**

 9   **any of the 150 individuals who liked this particular**

10   **video, do you?**

11        A.   No, but the point is is that TikTok had an

12   obligation under the DMCA 512 to take these images

13   down in an expedient manner.  14 out of the 25 are

14   still up.  That's more than half.  That's not

15   expedient.  Over 30 days is not expedient.

16             So if TikTok doesn't take them down, TikTok

17   is then responsible for the infringement.

18             MR. KEYES:  Counsel, just as a courtesy, I

19   have a lot of questions for every single one of

20   these videos.  And so if your client wants to go on

21   these diatribes, that's fine by me, but we're going

22   to be here until late in the evening.

23             So do with that information if you will

24   but --

25             THE WITNESS:  We're not going to be here

1   questions about each video, sir.

2         A.   Sure.

3         Q.   The 150 likes from the users -- the 156

4   likes on this very first video, you don't know --

5   you don't know where those individuals are located,

6   do you?

7         A.   No.

8         Q.   And you don't know when they joined TikTok,

9   do you?

10        A.   No.

11        Q.   You have no facts to show that these 150

12   users were drawn to TikTok based on this video, do

13   you?

14        A.   Well, they actually came to it.  I mean,

15   they're here for a reason, and they liked the video.

16   It's all part and parcel of the package, no?  No one

17   goes to TikTok for one video.  They go to be

18   entertained.  I'm part of the entertainment circus

19   that you provide.

20        Q.   So I'm asking if you're aware of any facts

21   that 1- -- that these 150 users, if they join the

22   TikTok platform --

23        A.   No.

24        Q.   -- because they were -- wait.  Wait, and

25   let me answer my question -- let me ask my question,

1       A.  No.  I don't see how that pertains to

2   anything in the world here.

3       **Q.  You don't know why they joined TikTok, do**

4   **you?**

5       A.  No.

6       **Q.  Or when they joined TikTok for that matter?**

7       A.  No.  But again, they -- they joined for

8   whatever reason, but they come to get entertained,

9   and they're being entertained by my work that was

10  stolen and not taken down by TikTok.

11      TikTok has refused to take it down.  I keep

12  telling you.  Go to page 15 and -- go to page 15 and

13  see.  That video is still up.

14      **Q.  So you would agree with me that you have no**

15  **facts to show that any of these 6,000 users were**

16  **drawn to the TikTok platform because of this video**

17  **that appears on Exhibit 21; right?**

18      A.  Well, I think that --

19          MR. ALEJANDRINO:  Object to form.

20          THE WITNESS:  No, I don't.  But again, I

21  think that would be pertinent if we were asking for

22  actual damages.

23      We're not asking for actual damages.  We're

24  asking for statutory damages, I believe.  I'm going

25  to defer to my attorney on that, though.

**Confidential**        Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1    Q.   How many times has that happened?

2    A.   Well, once for two images for $300,000 plus

3    legal fees.

4    Q.   And that was a statutory damage award

5    awarded by a court of law?

6    A.   Yeah.

7    Q.   Okay.   What case was that?

8    A.   Grecco Productions vs. Michael Sapp.

9         S-a-p-p for Susan's benefit.

10   Q.   Other than that one case, have you received

11   a statutory damage award of $150,000?

12   A.   No.   But we've certainly received statutory

13   damage awards of 80-, of 60-, of large amounts.

14   Q.   As you sit here today, sir, you have no

15   facts showing that the user that posted this video,

16   filmed the video that is shown here reflected on

17   page 4 of the PDF, that this individual generated

18   any revenue as a result of using your photograph, do

19   you?

20        MR. ALEJANDRINO:   Object to form.

21        THE WITNESS:   Yeah, but that's why God

22   created statutory damages; right?

23   BY MR. KEYES:

24   Q.   I thought Congress created them.

25   A.   I'm being -- trying to have a little sense

1    A.  Well, that would be a viral video; right?

2  That it was taken and reposted, that's what makes it

3  viral?

4    **Q.  Well, I guess viral is in the eye of the**

5  **beholder, but I think most people think a viral**

6  **video is one that really takes off and has a**

7  **tremendous amount of likes and shares and recomments**

8  **and posts and all --**

9    A.  And reposting is my point.  That's what I

10  was referring to.

11    **Q.  Okay.**

12    A.  When it gets reposted.

13    **Q.  With respect to the 11 people that liked**

14  **this video, you don't know who they are, do you?**

15    A.  No.

16    **Q.  You don't know when they joined TikTok?**

17    A.  No.

18    **Q.  You don't know why they joined?**

19    A.  No, nor do I care.

20    **Q.  You have no facts to suggest that they were**

21  **drawn to Tiktok so that they could view your video;**

22  **right?**

23    A.  No idea.  Again, I think we should -- I

24  think we should name -- we should amend the

25  complaint and name all of your users.

1   anecdotal whether it was this specific video or not.

2   But to be entertained by videos like this and for

3   your client to make money off that traffic.

4        **Q.  But you haven't spoken with any of these**

5   **individuals, have you?**

6        A.  The answer to that is still no, and I know

7   none of them specifically.

8        **Q.  Right.  So you don't know specifically why**

9   **any of these individuals joined TikTok?**

10       A.  Well, they came to look at TikTok videos.

11  I can tell you that from -- from anecdotal, you

12  know, logical information.  They're on TikTok to be

13  on TikTok to look at what TikTok -- what content

14  TikTok has to offer.

15       **Q.  You're not aware of any facts that show any**

16  **of these individuals were drawn to join TikTok**

17  **because of this En Vogue video, are you?**

18       A.  I didn't say that.  I said they're there to

19  go to TikTok to look at the videos, and my video is

20  one of those videos.

21       **Q.  I know.  I just asked you the question.  I**

22  **didn't say you said that.**

23       A.  No.

24       **Q.  So again, sir, you can answer my question**

25  **so we have a clear record.**

1        A.   No.  I said -- I said it.  No, no.

2        Q.   Mr. Grecco, please let me finish my

3    question, sir.

4             As you sit here today, you have no facts to

5    suggest that any of the users that liked, shared,

6    comment or saved this En Vogue video came to TikTok

7    and were drawn to the platform because of this

8    video, do you?

9        A.   No.

10       Q.   Thank you.  Let's go to GRECCO_000436.

11   That's going to be, I think on page -- Mr. Grecco, I

12   believe it's going to be page 37 of the PDF.

13       A.   All right.

14       Q.   You recognize this, don't you?

15       A.   Yep.

16       Q.   This is -- hold on.  My video -- my image

17   isn't loading now.  Bear with me.  This one

18   specifically was posted by weloverealmovies; right?

19       A.   Okay.

20       Q.   It's a 49-second video, isn't it?

21       A.   Yes.

22       Q.   How long is your image shown in the video?

23       A.   Well, you're showing me a screenshot so I

24   would have to go to the video in the link that you

25   provided.  And it's shown for 2 seconds and it's --

1          Q.   No idea why they joined TikTok?

2          A.   Correct.

3          Q.   And you are not aware of any facts that

4     show any of these individuals were drawn to TikTok

5     because of this video; right?

6          A.   Correct, yes.

7          Q.   So it sounds like -- we've gone through a

8     number of these, Mr. Grecco, and it sounds like the

9     answer is going to be the same with respect to each

10    one of these videos; is that right?

11         A.   Yes.

12         Q.   Okay.  So what I'd like to do, you know, to

13    be respectful of your time because we still have

14    quite a bit of material to get through today, I'd

15    like to just ask a series of questions so that we

16    can make it real clear for the record, okay?

17         A.   Okay.

18         Q.   And if you can, if you're able to answer,

19    you know, in one-word answers, not to put -- not to

20    put words in your mouth -- this will go really fast.

21         A.   Okay.

22         Q.   Okay.  Mr. Grecco, I'm asking you

23    specifically with respect to Exhibit 21 this series

24    of questions, okay?

25         A.   Okay.

Confidential        Michael Grecco Productions, Inc. vs.
                                                                    TikTok, Inc.

1        Q.  With respect to all of the videos in

2   Exhibit 21, I'm speaking specifically with respect

3   to the users that saved any of videos, you have no

4   idea who any of those individuals are; right?

5        A.  That is correct.

6        Q.  And with respect to all of these

7   individuals that have either liked, commented,

8   shared, or saved any of the videos, you have no idea

9   when they joined TikTok?

10       A.  That is correct.

11       Q.  And you have no idea why they joined

12   TikTok; right?

13       A.  That is correct.

14       Q.  And you're not aware, again, with respect

15   to all of these individuals that either liked,

16   commented, shared, or saved any of the videos

17   reflected in Exhibit 21, you have no facts to

18   suggest that they were drawn to TikTok because of

19   these videos; right?

20       A.  That is correct.

21          MR. KEYES:  Okay.  Can you please go to

22   Exhibit 22.

23          (Exhibit 22, Takedown Notices,

24   GRECCO_000534-GRECCO_000600, marked for

25   identification.)

                                                              **Page 254**

**Confidential**    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

```
 1              So I believe these are the 27 that are the

 2    in the complaint, but there are multiple sightings

 3    of some of the same images, and I don't think these

 4    contain all of the -- I don't think these contain

 5    all of the takedown notices for the images that were

 6    infringed on -- the same images that were infringed

 7    multiple times.

 8              Does that make sense now?

 9              One.

10    BY MR. KEYES:

11         Q.  I'm not sure that it does, but let me get

12    at this a slightly different way.

13              These are all DMCA takedown notices that

14    were sent -- that you authorized to be sent to

15    your -- to TikTok by your company; right?

16         A.  Yes.

17         Q.  All right.  Did the same individual draft

18    all of these DMCA notices?

19         A.  I don't know.

20         Q.  Okay.  Do you know who drafted these DMCA

21    notices?

22         A.  I don't know.

23         Q.  Did you review these DMCA notices before

24    they were submitted to TikTok?

25         A.  I did not.
```

Page 258

**Confidential**    Michael Grecco Productions, Inc. vs.
                                        TikTok, Inc.

1      Q.  Do you know if Ms. Waterman reviewed these

2   DMCA notices before they were submitted to TikTok?

3      A.  I don't believe that anyone reviewed it.

4   It's a form.  The information gets plugged into it.

5   And the person sending them has authority to send

6   them.

7      Q.  Okay.  Well, you see this very first one,

8   sir, there's a couple of attachments, for example?

9      A.  Right.

10      Q.  So those attachments would have been

11   attached by someone; right?

12      A.  Oh.  I'm not saying a human being didn't

13   send this on my behalf.  I'm just saying I didn't

14   write it, and I didn't review each one before it was

15   sent.

16      Q.  Okay.  You're aware that, under the DMCA,

17   there's certain criteria that need to be satisfied

18   in order for a DMCA notice to be valid; right?

19      A.  I am.

20      Q.  So somebody would have authored all of

21   these DMCA notices and included the relevant

22   information required by statute; right?

23      A.  We had a law firm do the initial one, and

24   then we have an offshore worker who does -- who

25   plugs in the information and sends them out and

 1  carbon copies me.

 2          And I get a copy of it, and it gets filed

 3  into a DMCA folder that I keep in my email.

 4      Q.  Okay.  So back to my question in terms of

 5  who prepared these DMCA notices in this case, you

 6  don't know?

 7      A.  I don't know.

 8      Q.  Would Ms. Waterman know?

 9      A.  She would.

10      Q.  Okay.  With respect to each and every one

11  of these DMCA notices in Exhibit 22, do you believe

12  that the -- the claims or the allegations were

13  made -- at the time they were made, were they true

14  and accurate?

15      A.  Yes.

16      Q.  And you stand by them; right?

17      A.  I do.

18      Q.  And it's your position that the allegations

19  of infringement in these DMCA notices were true and

20  accurate even though you did not consider fair use

21  before sending these DMCA notices; right?

22          MR. ALEJANDRINO:  Object.  Object to form.

23          THE WITNESS:  Correct.  I still don't

24  consider fair use; correct.

25          MR. KEYES:  Can we go to Exhibit 23,

**Confidential**

1    licensing photographs on mgpstockphotos.com?

2        A.  It depends on the year.  I mean, anywhere

3    between -- I mean, we're working on a deal with a

4    condominium complex in Miami which is going to be

5    worth $150,000.  But anywhere, you know, 20,000,

6    30,000 in licensing.

7        Q.  So let's just take the most recent year,

8    the complete year.

9            Are you on a -- in terms of how you run

10    your operation, are you on a calendar year?

11        A.  Cash basis calendar year, yes.

12        Q.  So for the calendar year 2024, how much

13    licensing revenue did you generate through

14    mgpstockphotos.com approximately?

15        A.  I don't know.  People -- people reach out

16    to us to license.  I don't necessarily know.  If

17    they've seen the picture there, they've seen it on

18    my website, they saw it on the Days of Punk website.

19    I'm not sure.  There's -- we don't keep records of

20    who has found it on PhotoShelter.

21        Q.  Okay.  Fair enough.  But in terms of you

22    did mention that people can actually go on to that

23    website and add photos to a cart.

24        A.  People can license through the platform;

25    correct.

Michael Grecco

1    Q.  Right.  So I'm referring specifically to

2    the revenue generated through -- by people that got

3    on the platform and licensed works?

4    A.  Zero.

5    Q.  Zero for 2024?

6    A.  Yeah.  But that -- again, no one uses --

7    the cart, usually they want to have a confirmation

8    of a specific license, they want to give us the

9    details, the print run, the record cover run, the da

10   da da da da da da, you know, the space, how big it's

11   being used, da da da, and we usually negotiate that.

12   Q.  Okay.  So for 2023, same answer?  Zero in

13   terms of the amount of revenue generated by somebody

14   getting on to MGP Stock Photos and purchasing a

15   license?

16   A.  Using their cart; that is correct.

17   Q.  Okay.

18   A.  How much revenue we got because they were

19   posted there and they contacted us, it is not

20   correct.  It is not 0.

21        But using the cart, I will in a limited

22   fashion say you're correct.

23   Q.  Would it be the same answer for 2022?

24   A.  Yep.

25   Q.  Same answer for 2021?

1      A.  Yeah.  I -- there was one instance where

2  someone bought a print using the cart, and I think

3  that in the entire history of us using that

4  PhotoShelter site, that was the only time someone

5  used the cart.

6      **Q.  Okay.**

7      A.  Amanda Beard's husband bought her a print,

8  the Olympian, of when I shot her, so . . .

9          MR. KEYES:  Exhibit 24, please.

10          (Exhibit 24, 10/12/94 Stock Invoice,

11  GRECCO_000608-GRECCO_000607, marked for

12  identification.)

13          THE WITNESS:  Okay.

14  BY MR. KEYES:

15      **Q.  Do you recognize this document?**

16      A.  I do.

17      **Q.  And what is it?**

18      A.  It's an invoice.

19      **Q.  Who is Delphi Internet?**

20      A.  It was an Internet service provider back in

21  the day.

22      **Q.  Okay.  And this is one of those invoices**

23  **that you drafted; right?**

24      A.  Well, I drafted it to Maggie, yeah.  I

25  drafted it to Maggie, and I think she did the

 1   is now.

 2       Q.  What "X File" image in particular does this

 3   invoice relate to?

 4       A.  The one that Fox used for an ad which is

 5   the hallway with the light glowing and . . .

 6       Q.  Is it one of the photograph at issue in

 7   this lawsuit?

 8       A.  No.

 9       Q.  So this was $5,000 for a national ad

10   campaign at the height of "The X Files" popularity.

11          You would agree with me?

12       A.  Yeah.  31 years ago; that's correct.

13          MR. KEYES:  Okay.  Thank you.

14          Let's pull up Exhibit 25, please.

15          (Exhibit 25, 7/25/00 Michael Grecco

16   Photography Stock Invoice, GRECCO_000612, marked for

17   identification.)

18          THE WITNESS:  I charge more now.

19   BY MR. KEYES:

20       Q.  Let me know when you have it, sir.

21       A.  Okay.  Just came in.

22          Okay.

23       Q.  What is this document?

24       A.  An invoice.

25       Q.  Okay.  Dated July 25th, 2000; yeah?

```
 1        A.  Correct.

 2        Q.  Addressed to Thomas Fiske of Anderson

 3   Consulting; right?

 4        A.  Correct.

 5        Q.  Who is that?

 6        A.  My client.

 7        Q.  So Anderson Consulting is a client of

 8   yours?

 9        A.  It's now Accenture, but yes.  They were for

10   many, many years.

11        Q.  Okay.  So this was for the use of five

12   images; right?  Four images from 1997 annual report;

13   Right?  Plus two George Shaheen all on the worldwide

14   web.

15        A.  Correct, right.

16        Q.  What were the five images from the annual

17   report, do you recall?

18        A.  I do not.

19        Q.  You don't know if they're images of

20   celebrities?

21        A.  They're images of their clients that I shot

22   for them.  And they continued to use it, so we

23   billed them yearly for that use.

24        Q.  So are these images of celebrities, sir?

25        A.  They're images of their clients.  They're
```

**Confidential**    Michael Grecco Productions, Inc. vs.
TikTok, Inc.

```
 1              (Recess taken from 4:21 p.m. to 4:23 p.m.)

 2              THE VIDEOGRAPHER:  Time is 4:23 p.m.  We

 3    are back on the record.

 4              MR. KEYES:  Exhibit 26, please.

 5              (Exhibit 26, 1/14/11 Michael Grecco

 6    Photography Stock Invoice, GRECCO_000628, marked for

 7    identification.)

 8    BY MR. KEYES:

 9         Q.  Let me know when you have it up,

10    Mr. Grecco.

11         A.  Just came in.  Loading now.

12              Okay.  Go ahead.

13         Q.  This is an invoice.  Who is the Propane

14    Educational and Research Council?

15         A.  I think it's like the milk council.  It's

16    the council that promotes propane use.

17         Q.  So this provided a license "for the

18    exclusive use in perpetuity of the five images for

19    the propane advertising campaign series;" right?

20         A.  Yes.  It was, like, a final purchase, I

21    believe.

22         Q.  And were any of the individuals in those

23    images, were they celebrities, famous people?

24         A.  No, no.  Actor/model.

25         Q.  So none of the images that were licensed
```

**Page 272**

**Confidential**

1   pursuant to Exhibit 26 are at issue in this lawsuit;

2   right?

3        A.   Correct.

4             MR. KEYES:   Exhibit 27, please.

5             (Exhibit 27, 2/28/14 Michael Grecco

6   Photography Stock Invoice, GRECCO_000629, marked for

7   identification.)

8   BY MR. KEYES:

9        Q.   What is this document, sir?

10            THE VIDEOGRAPHER:   Sorry, Mr. Grecco.   That

11  is the same one.

12            THE WITNESS:   I'm well aware.   You want me

13  to look at the other 27.

14            Okay.   Go ahead.

15  BY MR. KEYES:

16       Q.   It's addressed to G+j Corporate Editors.

17       A.   Okay.

18       Q.   Who is that?

19       A.   A magazine out of Germany.

20       Q.   So "use of three images"?

21       A.   It's called Capital/Maja Nieveler, yes.

22       Q.   Okay.   These were images, the Google

23  founders; right?

24       A.   Yeah.   This was a license after the shoot;

25  that's correct.

1      Q.  Okay.  Does this license -- does this

2  relate to the Google founder image at issue in this

3  lawsuit?

4      A.  I believe it does.  I believe, if there are

5  three images, that's one that everyone always likes

6  to use.  I -- that's from memory.  I can't state

7  with 100 percent certainty.

8      Q.  So it was a different price for the one

9  cover photo versus the full page images inside;

10  right?

11      A.  No.  I think it was one lump sum that we

12  negotiated.

13      Q.  Okay.  So there were no time limitations

14  set forth in this invoice, were there?

15      A.  Well, it says one time publication rights

16  in one issue with the magazine.  So the time

17  limitation is how long -- however long that magazine

18  runs:  30 days, a week.

19         The time limitation is right there.  It's

20  limited to one issue.

21         MR. KEYES:  Exhibit 28, please.

22         (Exhibit 28, 10/13/15 Michael Grecco

23  Photography Stock Invoice, GRECCO_000630, marked for

24  identification.)

25         THE WITNESS:  Okay.

Michael Grecco

```
 1   BY MR. KEYES:
 2        Q.  This is another one of the invoices that
 3   you drafted; right?
 4        A.  Yep.
 5        Q.  Did you personally draft this one?
 6        A.  I think so, yes.
 7        Q.  Who is HelloGiggles?
 8        A.  That's not the -- that's not the invoice --
 9   that's not what I'm looking at.  I'm looking at an
10   invoice to Business Insider.
11        Q.  Sorry about that.  I might be looking at
12   the wrong one here.
13           Right.  Business Insider.  Sorry.  I think
14   I was looking at the --
15        A.  All good.
16        Q.  Right.  So this is the one for the Google
17   founders; right?
18        A.  Correct.
19        Q.  What's a carousel?
20        A.  A carousel is when someone on the web puts
21   a bunch of, like, 12 images together, and you click
22   through them.  The word derives from when there
23   was -- slideshow carousels where you would go
24   through the images in a Kodak carousel projector.
25        Q.  So this license, it's not limited to a
```

**Page 275**

```
 1              I believe they rolled it into their home
 2   page, blah blah blah blah blah, so . . .
 3         Q.  And again, the "X File" images, the one,
 4   the flashing light one?
 5         A.  The flashlight one.
 6         Q.  The flashlight one, yes.  The 22nd
 7   photograph in your complaint here; right?
 8         A.  Correct.
 9              MR. KEYES:  Exhibit 33, please.
10              (Exhibit 33, 9/27/17 Michael Grecco
11   Photography Stock Invoice, GRECCO_000635-
12   GRECCO_000639, marked for identification.)
13              THE WITNESS:  Okay.
14   BY MR. KEYES:
15         Q.  It's an invoice addressed to Here Media
16   LLC?
17         A.  Yep.
18         Q.  What is Here Media LLC's business, if you
19   know?
20         A.  Websites.
21         Q.  What do you mean websites?
22         A.  Well, it was used on out.com.  So they're
23   the parent company for at least one website.
24         Q.  Okay.  And how did this license come about?
25   Is this another one of those instances where --
```

**Confidential**    **Michael Grecco Productions, Inc. vs.**
                                                            **TikTok, Inc.**

1       A.  This is a -- this is a retroactive license,

2   yes.

3       **Q.  So they didn't reach out to you to license.**

4   **You found that they were allegedly infringing, and**

5   **you reached out to them?**

6       A.  Correct.

7       **Q.  And then you negotiated the settlement**

8   **agreement of 37- --**

9       A.  -5.

10      **Q.  Yeah.  $3,750; right?**

11      A.  Yeah.  And just so you know, the terms and

12  conditions after 1998 is page 2 of the agreements,

13  so you do have them.  So the Ts and Cs that go on

14  the back of every invoice are page 2 of this

15  invoice.

16      **Q.  Yeah.  But as you can tell, sir, if you**

17  **look at this, you can't -- it's illegible.**

18      A.  Well, I bet there's better copies of this

19  in your paperwork.

20      **Q.  Okay.  All right.**

21      A.  I don't know if it's illegible because it's

22  been converted and put on the web and da da da da

23  da.  Like, so . . .

24      **Q.  All right.  Let's go to --**

25      A.  Also looks like it was rescanned because we

Michael Grecco

Confidential        Michael Grecco Productions, Inc. vs.
TikTok, Inc.

1  Productions Invoice, GRECCO_000642- GRECCO_000645,

2  marked for identification.)

3  BY MR. KEYES:

4      Q.  This is another Stock Invoice addressed to

5  Livingly Media.

6          Do you see that?

7      A.  Uh-huh.

8      Q.  Is this another instance, sir, where --

9  well, first off, who is Livingly Media?

10     A.  Another platform.  Another website.

11     Q.  And this is another website where they had

12  used one of your images, and you entered into this

13  agreement to settle a potential dispute; right?

14     A.  We created a -- correct.  We created a

15  retroactive license for them.

16         MR. ALEJANDRINO:  And I'm going to object

17  as to form and just to the extent that these are --

18  invoices are being referred to as settlements.

19  They're invoices and licensing.

20  BY MR. KEYES:

21     Q.  Okay.  But as you stated, Mr. Grecco, this

22  was to resolve -- they paid you, and then you didn't

23  sue them; right?

24     A.  This is a retroactive license.  These

25  images reflect -- these invoices reflect a

Page 288

1        A.  Correct.  They had to take it down.  And

2    this is for the flashlight picture.  You can see

3    it's included there.

4        **Q.  Okay.  So the fee here was for $15,000 for**

5    **two years of use of the flashlight picture; right?**

6        A.  Correct.

7            MR. KEYES:  Let's look at Exhibit 36.

8            (Exhibit 36, 5/15/19 Michael Grecco

9    Photography Stock Invoice, GRECCO_000646-

10   GRECCO_000650, marked for identification.)

11           THE WITNESS:  Okay.

12   BY MR. KEYES:

13       **Q.  Another Stock Invoice dated May 15, 2019;**

14   **right?**

15       A.  Yep.  And it's a retroactive license.

16       **Q.  Okay.  Again, the license reflected in**

17   **Exhibit 36 was potentially to settle a claim that**

18   **you had against MTRNetwork.net?**

19       A.  It's a retroactive license because we found

20   the -- an image on their network.

21       **Q.  Right.**

22       A.  MTRN Network.  Or MTRNetwork.

23       **Q.  They didn't reach out to you to negotiate a**

24   **license up front.  This is --**

25       A.  Correct.  We found it afterwards, that's

1  correct.

2      Q.  And do you recall if you sent them a demand

3  letter?

4      A.  I'm sure we did.

5      Q.  The fee here is for $10,000 for one of the

6  "X File" images for a period of over four years;

7  right?  A licensing period; right?

8      A.  Yes.

9          MR. KEYES:  Exhibit 37.

10         THE REPORTER:  I'm sorry, I didn't hear the

11 answer.

12         THE WITNESS:  Yes.  The answer is yes.

13         MR. KEYES:  Exhibit 37, please.

14         (Exhibit 37, 6/25/19 Michael Grecco

15 Photography Stock Invoice, GRECCO_000651-

16 GRECCO_000656, marked for identification.)

17 BY MR. KEYES:

18     Q.  This is another Stock Invoice issued by you

19 to Lifedaily.com; right?

20     A.  Yes.

21     Q.  And this relates to another "X File" image;

22 right?

23     A.  Well, it relates to the same flashlight

24 picture.

25     Q.  Right.

Confidential        Michael Grecco Productions, Inc. vs.
                                                              TikTok, Inc.

```
 1        A.  Which is almost in every one of these
 2   cases.
 3        Q.  And this is another instance where you
 4   found that Lifedaily.com was using this image.  And
 5   you sent them a demand letter, I take it; yes?
 6        A.  Yes.
 7        Q.  So this license agreements ended up
 8   potentially -- or not potentially.  It ended up
 9   resolving your copyright infringement claim that you
10   threatened against them?
11        A.  I don't know if we made any threat against
12   them, but we -- they settled the claim, yes.
13        Q.  In your demand letter, you demanded that
14   they stop using the photograph because it was
15   infringing; right?
16        A.  Well, look.  Every one of these is a
17   negotiation.  So if they want to pay more and
18   continue to use the photograph, they can pay more.
19   Like, every one of these is a negotiation based on
20   the size of the company, the size of the platform,
21   so on and so forth.
22        Q.  So why was there a license to MTRNetwork
23   for $10,000 for four years and $7,500 for Lifedaily
24   for five years?
25        A.  Again, it's all a negotiation, you know.
```

1  litigation.  It was related to seeing an image and

2  generating a retroactive license.  It's not related

3  to litigation until we send it to an attorney to

4  file for litigation.

5       Q.  Got it.

6       A.  So you're mischaracterizing again what I

7  said previously.

8       **Q.  So starting back at Exhibit 23, all of the**

9  **licenses from Exhibit 23 through Exhibit 38 that**

10 **we've looked at, these were all retroactive**

11 **licenses; right?**

12      A.  Well, Exhibit 23 is the About Me on my

13 stock photo.

14      **Q.  My apologies.  Exhibit 24.**

15      A.  No.  That's not a retroactive -- I believe

16 they came to us, so the answer is no, from my

17 recollection.

18         Let's look at 25.  No.  That was -- he came

19 to us.  I think it just took us -- he was a

20 long-term client.  He came to us and negotiated it.

21         No for 26.

22         No for 27.

23      **Q.  Wait.  When you say "no" --**

24      A.  No, they were not -- they were not from me

25 discovering anything.  It was an active negotiation

1  when the client wanted to continue use.

2      **Q.  Okay.  So Exhibit 27, you said that's not a**

3  **retroactive license?**

4      A.  No.  I said Exhibit 25.

5          Exhibit 26 is not.

6          Exhibit 27, let's look.  That's not either.

7          So again, you're mischaracterizing the

8  facts here.  None of these -- up and to -- right now

9  up and to the Capital/Maja whatever, none of them

10  are retroactive licenses, so --

11      **Q.  Okay.  Well, let's go back then.  And I'm**

12  **not mischaracterizing anything.  I'm asking you to**

13  **clarify for me, sir.**

14      A.  Okay.

15      **Q.  So --**

16      A.  From Exhibit 28 on, no.  And I don't

17  believe that Business Insider is a -- was a --

18  pursuant to -- they wanted to use the images for

19  that story.

20          So I'll tell you when the first one is.

21          HelloGiggles is the first one.

22      **Q.  What exhibit are you referring to?**

23      A.  Well, it's Bates No. 000631.  Exhibit 29.

24          So from 29 forward, yes, they're

25  retroactive licenses.

1         Q.   Okay.  Thank you.

2              Exhibit 38, please.  Yeah, Exhibit 38.  Let

3    me know when you're there.

4         A.   I'm here.

5         Q.   Is this another retroactive license?

6         A.   Yes.

7         Q.   Okay.  So Exhibit 38 is a license that you

8    provided to a photograph because what?  You found

9    that New Beverly Cinema was using --

10        A.   Yes.

11        Q.   -- your content?

12        A.   Yes.

13        Q.   And is this the Andy Garcia photograph

14   that's at issue in this case?

15        A.   Yes.

16        Q.   So this license fee that they paid to you

17   was to resolve a claim against -- for using a

18   photograph without your permission?

19        A.   On Facebook; that's correct.

20        Q.   And it was to ultimately resolve a claim

21   against them; right?

22        A.   It was ultimately -- yes.  It -- yes.  Not

23   a litigation, but it was ultimately to resolve an

24   unauthorized use.

25             MR. KEYES:  Got it.

1          Exhibit 39, please.

2          (Exhibit 39, 11/15/19 Michael Grecco

3    Photography Stock Invoice, GRECCO_000665-

4    GRECCO_000670, marked for identification.)

5    BY MR. KEYES:

6          **Q.   There is another Stock Invoice addressed to**

7    **Fifth Group Restaurants LLC; right?**

8          A.   Yes.

9          **Q.   Again, relates to Andy Garcia image.**

10         A.   That is correct.

11         **Q.   And is that the same Andy Garcia image**

12   **that's at issue in this case?**

13         A.   That is correct.

14         **Q.   And this was another retroactive license?**

15         A.   That is correct.

16         **Q.   And you found that Fifth Group Restaurants**

17   **was using this photograph, and you reached out to**

18   **them.  You sent them a demand letter?**

19         A.   That is correct.

20         **Q.   And then ultimately resolved that claim**

21   **against them for a license fee of 8,500?**

22         A.   That is correct, yep.

23         MR. KEYES:  Exhibit 40, please.

24         (Exhibit 40, 9/13/17 Michael Grecco

25   Photography Stock Invoice, GRECCO_000687-

1    GRECCO_000688, marked for identification.)

2    BY MR. KEYES:

3         Q.  Exhibit 40, this is an invoice addressed to

4    Enigma Media Group?

5         A.  Okay.  It's pulling up now.

6              Yes.

7         Q.  This is another retroactive license, isn't

8    it?

9         A.  That's correct.

10        Q.  And did you send Enigma Media Group a

11   demand letter claiming that they should take down

12   your content?

13        A.  No.  We sent -- we send them a demand

14   letter that they need to pay for our content.

15   Whether they get to keep it up or not is a matter of

16   how much they're going to pay and what the

17   negotiation is.

18        Q.  Got it.  So this $10,000 payment was to

19   resolve -- resolve a claim of copyright infringement

20   against them; right?

21        A.  Correct.

22             Well, yes.  It was for non-authorized use

23   of my work; that's correct.

24        Q.  Right.  Non-authorized use of your work,

25   don't you call that copyright infringement?

1      A.  Yes.

2      Q.  So it was to resolve the claim for

3   copyright infringement; right?

4      A.  Yes.

5      Q.  All right.  Thank you.

6          Bear with me here.  Sorry.  My -- I'm

7   having a technical glitch here.  Give me -- give me

8   just a moment.

9          I'm going to go quickly through your

10  copyright registrations.  I just want to make sure

11  that you authenticate them for the record, okay?

12     A.  Yep.

13         MR. KEYES:  Can we please pull up

14  Exhibit 41.

15         (Exhibit 41, Copyright Registration No. VA

16  1-431-698, GRECCO_000099-GRECCO_000152, marked for

17  identification.)

18  BY MR. KEYES:

19     Q.  Let me know when you have it.

20     A.  I have it.

21     Q.  This is a Copyright Registration No. VA

22  1-431-698; right?

23     A.  Correct.

24     Q.  And this is one of the registrations that

25  you've sued on in this case; right?

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify: That the foregoing proceedings were taken

4    before me at the time and place herein set forth;

5    that any witnesses in the foregoing proceedings,

6    prior to testifying, were administered an oath; that

7    a record of the proceedings was made by me using

8    machine shorthand which was thereafter transcribed

9    under my direction; that the foregoing transcript is

10   a true record of the testimony given.

11       Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review

14   of the transcript [ ] was [X] was not requested.

15       I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or any party to this action.

18       IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20   Dated: July 23, 2025

21

22

23   _____

24            Susan F. Magee, RPR, CCRR, CLR
              CSR No. 11661

25